UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

ANGELA D. HOLBROOK,

　　　　　Plaintiff,

v.　　　　　　　　　　　　Case No: 2:12-cv-284-FtM-29DNF

LEE COUNTY, FLORIDA,

　　　　　Defendant.

_____

## OPINION AND ORDER

This matter comes before the Court on the defendant's Motion for Summary Judgment (Doc. #38) filed on April 28, 2014. Plaintiff filed a Response to Defendant's Motion for Summary Judgment (Doc. #44) on May 19, 2014. Defendant filed Objections to Materials in Support of Plaintiff's Response (Doc. #45) on May 30, 2014, and plaintiff filed a Response to Defendant's Objections (Doc. #51) on June 4, 2014.

## I.

Plaintiff Angela Holbrook (Holbrook or plaintiff) initiated this action on May 22, 2012, by filing a Complaint (Doc. #1) asserting a single claim under 42 U.S.C. § 1983. Plaintiff alleges that Lee County (defendant) violated her constitutional right of free speech by "retaliating against her by subjecting her to undue scrutiny, reprimands, investigations and, ultimately, termination of employment as a direct result of her objecting to Lee County's

violations of various laws regulating emergency medical services, billing of those services to Medicare and/or Medicaid, and the safety of Lee County's operations." (Id. ¶ 35.) Holbrook avers that she spoke on matters of public concern in her capacity as a citizen and contends that she would not have been subjected to retaliatory conduct absent her constitutionally protected expression. (Id. ¶¶ 38-40.)

Defendant argues that it is entitled to summary judgment for the following reasons: First, defendant asserts that Holbrook has failed to produce evidence establishing that the decision to terminate her was made pursuant to a custom, policy, or practice of intentional retaliation. Second, defendant assert that plaintiff cannot establish a prima facie case of retaliation because she was not speaking as a private citizen or on matters of public concern. Finally, defendant argues that it had significant and substantial justification for plaintiff's termination that was unrelated to the alleged speech. (Doc. #38, p. 2.)

## II.

Summary judgment is appropriate only when the Court is satisfied that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." Baby Buddies, Inc. v. Toys "R" Us,

2

Inc., 611 F.3d 1308, 1314 (11th Cir. 2010).  A fact is "material"
if it may affect the outcome of the suit under governing law.
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A party
asserting that a fact cannot be or is genuinely disputed must
identifying those portions of the pleadings, depositions, answers
to interrogatories, admissions, and/or affidavits which it
believes demonstrate the absence or presence of a genuine issue of
material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986);
Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259-60 (11th
Cir. 2004).

In ruling on a motion for summary judgment, the Court views
all evidence and draws all reasonable inferences in favor of the
non-moving party.  Scott v. Harris, 550 U.S. 372, 380 (2007); Tana
v. Dantanna's, 611 F.3d 767, 772 (11th Cir. 2010).  However, "if
reasonable minds might differ on the inferences arising from
undisputed facts, then the court should deny summary judgment."
St. Charles Foods, Inc. v. America's Favorite Chicken Co., 198
F.3d 815, 819 (11th Cir. 1999) (quoting Warrior Tombigbee Transp.
Co. v. M/V Nan Fung, 695 F.2d 1294, 1296 (11th Cir. 1983) (finding
summary judgment "may be inappropriate even where the parties agree
on the basic facts, but disagree about the factual inferences that
should be drawn from these facts")).  "If a reasonable fact finder
evaluating the evidence could draw more than one inference from
the facts, and if that inference introduces a genuine issue of

material fact, then the court should not grant summary judgment." Allen v. Bd. of Pub. Educ., 495 F.3d 1306, 1315 (11th Cir. 2007).

**III.**

The following facts are taken in a light most favorable to the non-moving party, plaintiff:

Holbrook was hired as a paramedic by Lee County Emergency Medical Services (EMS) on November 17, 2005. (Doc. #1, ¶ 7; Doc. #38-1.) Plaintiff does not have a medical degree, nursing degree, or an emergency services degree, but came to Lee County with more than eight years of experience as a paramedic. (Doc. #38-9, pp. 12-16.) On June 7, 2007, Holbrook was promoted to the position of flight paramedic and was assigned to Lee County's Medstar program, which provided helicopter transport services. (Doc. #1, ¶ 10.)

The paramedics at Medstar were required to document the events that transpired during the transportation of a patient in a patient care report. (Doc. #44-2, p. 30.) The patient care reports were to be prepared in accordance with the guidelines set forth in a binder called "MEDSTAR Magic Language." (Id.) Patient care reports were electronically submitted and subsequently reviewed by plaintiff's supervisor, Lieutenant Michael Hamel (Hamel), as part of the quality assurance process. If Hamel was dissatisfied with a report, he would indicate the changes he desired in the quality assurance log and the paramedic responsible for the report would have to make the requested changes. (Id. at 32.) Hamel also

4

instructed the paramedics to add procedures that were not performed to the reports. (Id. at 33.) Holbrook testified that all of the paramedics had access to the quality assurance log and were instructed to review it to ensure that future reports were properly completed. (Id. at 33, 36, 65-66.)

Plaintiff believed that Medstar paramedics were required to use the language in the "MEDSTAR Magic Language" binder to maximize Medstar's profits. (Id. at 30.) Plaintiff also believed that the patient care reports were illegally altered to increase billing or to conceal instances in which proper care was not provided. (Id. at 32-34, 65-66.) In late 2007, Holbrook began to express her concerns about the use of the "MEDSTAR Magic Language" binder and the alterations to the patient care reports. Plaintiff raised these issues with Hamel and testified that she tried to maintain written records showing that Hamel was instructing the paramedics on how to complete the patient care reports. (Id. at 39.)

Plaintiff was also concerned that Hamel was billing Medicare and Medicaid at rates reserved for services provided by helicopters holding a "Part 135" certification with the Federal Aviation Administration (FAA). (Doc. #44-1, pp. 56, 66.) Plaintiff investigated the matter and was of the belief that Medicare and Medicaid were being billed for services rendered by helicopters lacking a Part 135 certification. Her investigation further

revealed that it was unlawful to bill for flight services absent a Part 135 certification. (Id. at 57.)

In January 2008, Holbrook met with Chief Chris Hanson (Hanson), Chief Pilot Robert Fulton (Fulton), pilot Rick Tackett (Tackett), paramedic Mike Grimm (Grimm), and mechanic Greg Schiegner (Schiegner) to express her concerns regarding the Part 135 certification. (Doc. #44-2, pp. 47-53.) There was general concern regarding the Part 135 certification throughout Medstar, (Doc. #38-8, p. 7), and everyone present at the meeting expressed their concerns regarding the same. (Doc. #44-2, p. 52.) After the meeting, Chief Hanson met with each of the attendees on an individual basis to further discuss the issues raised in the meeting. (Id.) Holbrook also spoke with each of the employees regarding whether things would be fixed or if Rick O'Neal (O'Neal), another supervisor, would retaliate against them for bringing things forward. (Doc. #44-2, p. 54.)

On January 22, 2008, Holbrook informed Hamel of the concerns she had regarding the lack of procedures for transporting psychiatric patients at Medstar. (Doc. #44-3, 14-15.) Holbrook raised additional concerns regarding the presence of deficient or inadequate equipment and reiterated her concerns regarding Medstar procedures with Hanson and O'Neal on January 28, 2008. (Id. at 15-20.) Two days later, O'Neal removed Holbrook from a flight and advised her that she was untrustworthy. (Id. at 6.)

On February 11, 2008, Holbrook sent Hamel an e-mail addressing equipment related issues and the prior shift's failure to properly document controlled substances.   (Doc. #44-5.)   Plaintiff sent Hamel an e-mail raising similar issues on February 15, 2008. (Doc. #44-6.)  On February 21, 2008, Lee County Medstar paramedics and pilots presented a letter to Hamel requesting that they not be partnered with Holbrook because they found her to be untrustworthy and a safety hazard.  (Doc. #44-7.)  Plaintiff was removed from flight status as a result of the letter.  Lee County's Department of Human Resources investigated Holbrook's removal from flight status and determined that the grounding of Holbrook was not "the appropriate course of action."[1]  (Id. at 8.)  The investigator concluded that the accusations of Holbrook being a "real and present safety hazard" were unfounded.  (Id.)  The investigator also determined that the accusations of Holbrook's untrustworthiness were fueled by rumors, gossip, and hearsay, most of which stemmed from Holbrook's presentation of issues and concerns to her supervisors.  (Id.)  Based on these findings, Holbrook was returned to flight status on March 21, 2008.

On May 12, 2008, Holbrook and fellow paramedic Robert Haynes (Haynes) were dispatched to effectuate a critical care

---

[1]According to the investigator's report, Hamel believed the only resolution to the situation was to move Holbrook back to the ground unit.  (Doc. #44-7, p. 6.)

interfacility transfer from the Lee Memorial Hospital Emergency Department to the Cape Coral Hospital Intensive Care Unit. (Doc. #38-3, p. 1.) The paramedics were presented with an elderly female in need of an immediate transfer to the intensive care unit at Cape Coral Hospital. (Id.) Dr. Christopher Robben (Dr. Robben), the treating physician, testified that the transfer was delayed by more than an hour because Holbrook, the medic in charge of the transfer, was questioning some of his orders and demanding additional orders that were not appropriate under the circumstances. (Doc. #38-7, pp. 7-8, 11.)

Dr. Joseph Lemmons (Dr. Lemmons), the Lee County Emergency Medical Services Director, learned of the incident and requested an accelerated investigation on the matter. (Doc. #38-5, p. 14.) Holbrook was subsequently placed on administrative leave, with pay, pending the outcome of the investigation. (Doc. #38-3, p. 2.) The investigative report, prepared by Hamel, reveals that Dr. Robben made the following statements to Dr. Lemmons during the investigation:

- "The paramedic, Angela, repeatedly questioned my decision making regarding this patient who was in septic shock. The patient was being transferred to Cape Coral ICU because we had no ICU beds available. I attempted to explain my treatment plan to her but she would not listen."

- "She refused to leave the ER until I gave her orders for a diprivan drip. I explained to her the fragility of this patient and my reasons for not wanting the patient on diprivan, primarily the hemodynamic effects on her

blood pressure.  She started the dirpivan drip in the ER on her own, against my wishes."

- "She refused to leave the ER until I gave her written orders for sedation for the patient even though the patient had just received vecuronium and ativan prior to their arrival."

- "It was crazy, I have never experienced this before. The patient needed to get to the ICU as quickly as possible, and the paramedic was delaying definitive care.  She was demanding, bizarre, and making nonsensical statements to both the nursing staff and to me."

(Doc. #38-3, p. 2.)[2]

Dr. Lemmons, O'Neal, Hamel, and Deputy Chief Dickerson reviewed the evidence obtained during the investigation and concluded that Holbrook's version of the incident lacked credibility.  Dr. Lemmons therefore revoked Holbrook's paramedic privileges.  (Doc. #38-3, p. 2.)  Because Holbrook's privileges were revoked, she was terminated by Medstar on May 16, 2008.  Haynes, however, was not subject to any disciplinary action.

## IV.

Public employees, like plaintiff, may bring First Amendment retaliation claims pursuant to 42 U.S.C. § 1983.  See Randall v. Scott, 610 F.3d 701, 703 (11th Cir. 2010).  Section 1983 imposes liability on any person who, under color of state law, deprives a person "of any rights, privileges, or immunities secured by the

---

[2]Dr. Robben adopted these statements as true and correct during his deposition.  (Doc. #38-7, pp. 11-12.)

Constitution and laws." 42 U.S.C. § 1983. A government entity cannot be found liable on a vicarious liability theory under § 1983, but can be liable if the entity is "found to have *itself* caused the constitutional violation at issue." Skop v. City of Atlanta, 485 F.3d 1130, 1145 (11th Cir. 2007) (emphasis in original) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694-95 (1978)). Thus, a plaintiff seeking to hold a government entity liable under § 1983 must show that: (1) her constitutional rights were violated, and (2) the municipality had a custom or policy that constituted deliberate indifference to that constitutional right, and (3) the custom or policy was the moving force behind the violation. Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1293 (11th Cir. 2009). "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the [entity]. . . . A custom is a practice that is so settled and permanent that it takes on the force of law." Cooper v. Dillon, 403 F.3d 1208, 1221 (11th Cir. 2005) (quoting Sewell, 117 F.3d at 489). "Proof of a single incident of unconstitutional activity is not sufficient to impose liability" against a municipality. Oklahoma City v. Tuttle, 471 U.S. 808, 823-824 (1985). See also Craig v. Floyd Cnty., 643 F.3d 1306, 1310-11 (11th Cir. 2011).

Defendant believes that summary judgment is warranted because plaintiff has failed to produce evidence establishing that the decision to terminate her was made pursuant to a custom, policy, or practice of retaliation. (Doc. #38, p. 7.) In response, plaintiff presented evidence of other claims of retaliation, including those of Fulton and another Medstar pilot, Arnold McAllister. (See Doc. #44-17, Doc. #44-18; Doc. #44-19; Doc. #44-20.) Defendant seeks to strike these exhibits on the grounds that they are inadmissible hearsay. (Doc. #45.) A district court may consider a hearsay statement in deciding a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form. Jones v. UPS Ground Freight, 683 F.3d 1283, 1293-94 (11th Cir. 2012). This appears to be the case with these exhibits, and therefore the motion to strike is denied. Because plaintiff has presented evidence of similar claims, which could establish a custom, policy, or practice, a genuine dispute of material fact exists as to this issue.

## V.

The constitutional right at issue in this case is the First Amendment right of free speech. "Speech by citizens on matters of public concern lies at the heart of the First Amendment, which 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" Lane v. Franks, 134 S. Ct. 2369, 2377 (2014) (quoting

<u>Roth v. United States</u>, 354 U.S. 476, 484 (1957)).  "This remains true when speech concerns information related to or learned through public employment."  <u>Id.</u>  Public employees do not relinquish their constitutional rights when they accept employment and public employers cannot condition employment on the relinquishment of constitutional rights.  <u>Id.</u>  There is considerable value in encouraging speech by public employees, for they are often in the best position to know what ails the agencies for which they work, but there is also a countervailing government interest in controlling the operations of its workplace.  <u>Id.</u>  Nonetheless, "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services."  <u>Garcetti v. Ceballos</u>, 547 U.S. 410, 418 (2006).

The law is well established that a state employee may not be discharged in retaliation for speech protected under the First Amendment.  <u>Vila v. Padron</u>, 484 F.3d 1334, 1339 (11th Cir. 2007) (citing <u>Rankin v. McPherson</u>, 483 U.S. 378, 383 (1987)).  In order to establish a claim of retaliation under the First Amendment, a plaintiff must show: "(1) she was speaking as a citizen on a matter of public concern; (2) her interests as a citizen outweighed the interests of the State as an employer; and (3) the speech played a substantial or motivating role in the adverse employment action."

Id. (citing Akins v. Fulton Cnty., 420 F.3d 1293, 1303 (11th Cir. 2005).  See also Lane, 134 S. Ct. at 2377.  If the plaintiff establishes these elements, the burden shifts to the defendant to prove that it would have made the same adverse employment decision absent the employee's speech.  Akins, 420 F.3d at 1303.

The Eleventh Circuit modified the first part of the inquiry, in accordance with the Supreme Court's holding in Garcetti, "to determine if an employee's speech has constitutional protection by deciding at the outset (1) if the government employee spoke as an employee or citizen and (2) if the speech addressed an issue relating to the mission of the government employer or a matter of public concern." Boyce v. Andrews, 510 F.3d 1333, 1342 (11th Cir. 2007) (citing D'Angelo v. Sch. Bd. of Polk Cnty., Fla., 497 F.3d 1203, 1209 (11th Cir. 2007)).  The first two elements of a retaliation claim are questions of law for the court to decide. See Brown v. Sch. Bd. of Orange Cnty, Fla., 459 F. App'x 817, 820 (11th Cir. 2012); Vila, 484 F.3d at 1339.

### A.

In order to determine whether plaintiff's speech is entitled to constitutional protection, the Court must first determine if she spoke as an employee or citizen.  The critical question under this step of the inquiry is "whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." Lane, 134 S. Ct. at 2379.  If

a public employee speaks pursuant to her "official duties," the employee is not speaking as a citizen and the speech is not protected.  Garcetti, 547 U.S. at 421.  When a court considers whether a government employee's speech was primarily related to her job, the result "must be determined by the content, form, and context of a given statement, as revealed by the whole record."  Connick v. Myers, 461 U.S. 138, 147 (1983).  A number of relevant, but non-dispositive factors have been established to assist in the determination of whether the speech is within the scope of an employee's duties, including the employee's job description, whether the speech occurs in the workplace, and whether the speech concerns the subject matter of the employee's job.  Abdur-Rahman v. Walker, 567 F.3d 1278, 1282 (11th Cir. 2009) (citing Garcetti, 547 U.S. at 420-421).

Plaintiff's alleges that the following instances of speech are protected by the First Amendment[3]:

## 1.    Patient Care Reports

Plaintiff's first instance of speech pertains to her belief that the patient care reports were illegally altered by Hamel to increase billing or to conceal instances in which improper care was provided.  After reviewing the "content, form, and context" of

---

[3]Each of plaintiff's concerns must be independently examined.  See Goffer v. Marbury, 956 F.2d 1045, 1050 (11th Cir. 1992).

plaintiff's concerns about the patient care reports, the Court concludes that plaintiff's speech is not constitutionally protected because the evidence indicates that she spoke as a government employee and not as a citizen speaking out on a matter of public concern. Plaintiff admitted that she was required to draft patient care reports and review the quality assurance log to ensure that she correctly prepared her reports. Plaintiff's testimony also reveals that she asked Hamel if the use of the "MEDSTAR Magic Language" binder and the alteration of patient care reports was proper. Furthermore, Holbrook stated that she would ask Hamel how to properly draft her patient care reports. (Doc. #44-2, p. 39.) It is clear that plaintiff's speech was within the bounds of her job description, occurred in the workplace, and was within the subject matter of her employment. See Garcetti, 547 U.S. at 422 (holding that calendar deputy's memorandum reporting false statements in an affidavit used to obtain a search warrant was made pursuant to his job duties and not protected because the calendar deputy went to work and performed the tasks he was paid to perform); Phillips v. City of Dawsonville, 499 F.3d 1239, 1242 (11th Cir. 2007) (City Clerk's speech regarding improper use of city resources and of behavior that may result in expense and liability for the City fell within her official duties even though not specifically enumerated); Vila, 484 F.3d at 1339 (employee who criticized what she believed was illegal or unethical behavior

of officials at Miami-Dade Community College, including noncompliance with bidding and request-for-proposal procedures was speaking as an employee).  This conclusion is further supported by plaintiff's efforts to maintain written records showing that the patient care reports were prepared in accordance with Hamel's instructions because plaintiff's actions demonstrate that her speech was reasonably related to the preservation of her job and possible litigation.  See Boyce, 510 F.3d at 1345 (if an employee raises an issue solely to further her employment interest, the First Amendment right to comment on that issue is entitled to little weight, even if the speech could arguably be viewed as a matter of public concern).  Accordingly, the Court finds that plaintiff's speech regarding the patient care reports was within scope of her official duties as a paramedic.

## 2.    The Part 135 Certification

Defendant asserts that plaintiff was speaking as an employee when she expressed her concerns regarding the Part 135 certification because "Lee County could not operate the Medstar division and charge for the helicopter services without the necessary certifications and paramedic participation." (Doc. #38, p. 16.)  After review of the record, the Court concludes that the material facts supporting defendant's argument are disputed.  Accordingly, summary judgment is denied as to this category of speech.

3.   **Procedure for Transporting Psychiatric Patients**

Defendant asserts that plaintiff's speech regarding the lack of documented procedures for transporting psychiatric patients was employee speech.  The Court agrees.  Plaintiff testified that she has, as a part of her job, treated psychiatric patients in need of medical attention on the ground and in the air.  (Doc. #44-3, pp. 14-15.)  When asked if she was looking for documented procedures on how to handle psychiatric patients, plaintiff responded with "that's correct."  (Id. at 15.)  Because plaintiff's concerns regarding the lack of documented procedures for the transportation of psychiatric patients were related to her duties as a paramedic and directed at her supervisor, the Court finds that plaintiff's speech was within the scope of her official duties.

4.   **Operations and Equipment**

Holbrook asserts that she spoke as a citizen when she expressed her concerns regarding Medstar's operations, the use of deficient and improper equipment, and the failure of a prior shift to properly document controlled substances.  The e-mails plaintiff sent Hamel regarding these concerns establish that the speech was within the scope of plaintiff's duties.  With respect to the documentation of controlled substances, plaintiff stated that she could not get the drugs replaced due to the prior shift's failure to document usage.  (Doc. #44-5.)  This is clearly related to the execution of her duties and the preservation of her job.

Plaintiff's concerns regarding Medstar's operations and the use of deficient or improper equipment were also raised in the e-mails, many in the form of a question.  (Doc. #44-5; Doc. #44-6.) All of the concerns raised in the e-mails pertained to the execution of plaintiff's duties, such as the presence of deficient equipment and communication procedures.  (Doc. #44-3, pp. 17-20.) These concerns are by their very nature related to the execution of plaintiff's job.  Thus, the Court concludes that plaintiff was speaking as an employee.

**B.**

Defendant's final and primary contention is that it had significant and substantial justification for plaintiff's termination that was unrelated to the alleged speech.  (Doc. #38, p. 2.)  The evidence shows that Holbrook was wrongfully grounded on multiple occasions because she was considered untrustworthy and that she was terminated after the incident on May 12, 2008, while her coworker was not subject to any disciplinary action.  This evidence, when viewed in a light most favorable to plaintiff, creates an issue of fact for the jury.

Accordingly, it is now

**ORDERED:**

1.  Defendant's Motion for Summary Judgment (Doc. #38) is **GRANTED in part and DENIED in part**.  The motion is granted as to plaintiff's speech regarding the patient care reports, the lack of

documented procedures for transporting psychiatric patients, and Medstar's operations, the use of deficient and improper equipment, and the failure of a prior shift to properly document controlled substances.   The motion is otherwise denied.

**DONE AND ORDERED** at Fort Myers, Florida, this __2nd__ day of September, 2014.


_____

JOHN E. STEELE
UNITED STATES DISTRICT JUDGE


Copies:

Counsel of record